## WEAVER v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted October 3, 1923. Reargued May 15, 1924. Decided June 2, 1924.)

No. 3997.

1. **Criminal law ⬳369(8)—Testimony as to similar acts between parties prior to offense charged admissible.**

   In a prosecution for statutory rape on one under age of consent, testimony concerning similar acts between the parties prior to offense charged is admissible.

2. **Criminal law ⬳1169(6)—Rape ⬳44—Evidence of subsequent marriage of parties held admissible, and not harmless because extreme penalty was not assessed.**

   In a prosecution for statutory rape, evidence of subsequent marriage of parties is admissible, in view of Code, § 808, as amended by Act April 19, 1920, authorizing jury to include death penalty in verdict, and also admissible to impeach prosecutrix's testimony denying marriage or affection for defendant, and exclusion was not harmless because jury did not assess death penalty.

Appeal from Supreme Court of the District of Columbia.

Walter W. Weaver was convicted of carnal knowledge, and he appeals. Reversed, and a new trial granted.

S. McC. Hawken, of Washington, D. C., for appellant.

Peyton Gordon and J. J. O'Leary, both of Washington, D. C., for the United States.

Before ROBB and VAN ORSDEL, Associate Justices, and SMITH, Judge of the United States Court of Customs Appeals.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROBB, Associate Justice. Under an indictment charging the defendant, appellant here, with carnal knowledge, he was convicted, and, the jury not having added "with the death penalty," sentenced to the penitentiary for 20 years.

The testimony for the prosecution was substantially as follows:

The prosecuting witness, who gave her name as Ruth Acton, stated that she was not married to the defendant, and, over objection, testified concerning her relations with him from the time she was 4 or 5 years of age. She further testified that on the 10th day of September, 1919, the defendant had sexual intercourse with her in the city of Washington, at No. 3217 Thirteenth Street, Northwest, "on the third floor back room"; that she fixed the time, because defendant's father died in the house next day; that as a result of this intercourse a child was born to her on June 14, 1920.

On cross-examination witness stated that she was afraid of the defendant and had never loved him. She then was shown a series of letters, bearing dates either immediately prior to or following the birth of the child, and while she was at the home of the nurse, a Miss Fields, where she had been taken by the defendant. In these letters, which she identified, witness alluded to the defendant as her husband and expressed affection for him. In other words, the contents of these letters were utterly inconsistent with her testimony, both as regards the question of marriage and her attitude at that time toward the defendant. But the court, sustaining the government's objection, refused not only to receive the letters in evidence, but to permit the witness to be cross-examined concerning their contents. Other letters, written by this witness prior to the birth of the child and while she was living with the defendant in Maryland, in which she expressed affection for him and contentment with her surroundings, likewise were excluded. The court also declined to permit an inquiry of this witness as to whether, when she was taken to the home of the nurse, it was her intention to return to the farm and her husband at the expiration of three weeks.

This witness, although specific as to incidents occurring many years before, was induced only after repeated questioning to fix the hour of the day upon which had occurred the incident resulting in the prosecution. She finally admitted that several people were in the house at the time and that the door of the room "was only partially closed; that it was in the daytime when it happened"; and that Mr. and Mrs. Howe, sister and brother-in-law of the defendant, had arrived at the house before the incident took place. Witness admitted going before the grand jury in Maryland, some time prior to her appearance before the grand jury in the District of Columbia, but denied she had there testified that she had no relations with the defendant in this District.

The court, over objection, also excluded evidence of the marriage of the parties several months prior to the birth of the child and of their cohabitation under the marriage in Maryland.

Miss Fields, the nurse, testified for the government that she had known the defendant since childhood; that defendant engaged her to care for the prosecuting witness during confinement and subsequently brought that witness to her. During an attempt to cross-examine Miss

Fields, various pertinent questions were asked, to which categorical answers could have been given. The answers to these questions, not only were unresponsive, but, in the light of other evidence, clearly indicated that, after assuming control of the prosecuting witness, the attitude of Miss Fields had become extremely hostile. She denied positively that her original agreement with the defendant contemplated that the prosecuting witness should remain with her only three weeks. Upon being shown a letter to the defendant, in which she said of the prosecuting witness, "She is doing well, is normal, and I do not look for any complications, and think she will be strong enough to leave here when her three weeks are up," witness said that was merely her "own statement." She finally said she had refused to let the prosecuting witness go back to the defendant, but denied that, when defendant was taking witness to her shack in the country, she had demanded $5,000 of him, with the threat that, if defendant did not pay this, she would have him prosecuted. It further appeared from the testimony of Miss Fields that she was the nurse in attendance upon defendant's father on September 10, 1919, and that he then was in a dying condition.

Following this testimony, the government rested.

The first witness for the defendant was a member of the grand jury of Prince George county, Md., before which the prosecuting witness had appeared at the April term, 1921. (Present indictment was found in December following.) This witness was a banker, farmer, and merchant, and apparently a gentleman of intelligence and character. He testified that he remembered Ruth Acton and that she testified "that her child was begotten on the 26th day of August, in the state of Maryland, and that she never had intercourse with Mr. Weaver in the District of Columbia." The cross-examination of this witness strengthened his testimony, for it elicited the fact that he had discussed the case with other members of the grand jury, after the prosecuting witness appeared before that body. This witness also gave character testimony for the defendant.

Mrs. Howe, to whom allusion already has been made, testified that she was married September 6, 1919, and was recalled from her honeymoon by notice that her father was dying; that she and her husband arrived at Union Station between 1 and 2 o'clock on the afternoon of September 10th, and were met by the defendant, who conveyed them in his automobile to her father's home; that defendant accompanied them to her father's room, and immediately thereafter left for his farm in the country (in Maryland), and did not return until between 10 and 11 o'clock that night; "that when she arrived Ruth (the prosecuting witness) was in the room with her (witness') father helping to care for him; that the defendant did not come to the room at any time between the time he returned between 10 and 12 o'clock at night; that Ruth was with witness practically all the time from the time witness arrived at the house until Ruth went to bed; and that at no time did the defendant come into the room where Ruth was, except when he brought witness to the house upon her arrival."

Mr. Howe, husband of the preceding witness, gave testimony to the same effect, as did Frank C. Weaver, a brother of the defendant.

Thereupon the defendant testified, and admitted having had improper relations with the prosecuting witness in Maryland on two occasions, prior to September, 1919, but denied having had such relations with her in the District of Columbia. A copy of the marriage license, showing the marriage of the defendant to the prosecuting witness, was offered in evidence but excluded by the court.

Defendant further testified that before the birth of the child he took the prosecuting witness to Miss Fields, a trained nurse and supposed friend of the family; that the understanding was that Ruth would not remain over three weeks after the baby was born, but would then return; that after the three weeks were up he "went to Miss Field's house, as he had been doing practically every day since Ruth was taken there, and Miss Fields would not let him take Ruth away"; that he made several trips thereafter to see Ruth and take her home, but Miss Fields always offered some excuse, and finally told him she was going to send Ruth to New York, "saying it would be better to do that before coming back to the farm; that on one of these occasions Miss Fields asked witness to take her in his automobile to her shack at Glen Echo; that on the way out Miss Fields told him she had consulted her brother, * * * and he told her that the marriage was illegal, and Miss Fields told witness that, unless he paid her $5,000, she was going to the district attorney in Marlboro and have witness sent to the penitentiary"; that one-half of this money was to be given to Ruth. Defendant further testified that he had nothing more to do with Miss Fields thereafter and was not permitted to see Ruth again.

This case is most unusual. From the admitted evidence, and that which defendant unsuccessfully sought to introduce, it conclusively appears that, upon discovering the result of his relations with the prosecuting witness, the defendant married her and provided her with a good home, where they lived happily together for several months prior to the birth of the child; that up to this time the attitude of the nurse, Fields, was friendly, as shown, not only by her own failure to deny it, but by the following letter from the prosecuting witness to the defendant's sister:

"By your letter you don't seem to know that Walter and I are married. Now, if I did not care for him, it would be different, but I love him and he me. So I consider that part settled. I was very much surprised at your question about Walter threatening me. I did not think you thought him that kind of a man. We had both agreed that when I was older we would be married, but the not telling was my own fault, and any girl who loved a man would have done the same in my place. It has turned out this way, and I am happy, happier than I ever was before. I must say I would be still happier if you look at it like mother and Cliff did. We went to see Miss Fields. She was not surprised, and said that she was very glad we were happy; that God and human nature were companions; that if we loved each other it is lovely, and I am sure I am happy and that I love him, and also that Walter loves me."

The record contains no reasonable explanation of the change of attitude by Miss Fields, which seems to have been communicated to the prosecuting witness, and to have determined her subsequent conduct, other than that testified to by the defendant. The prosecuting witness

was in the District of Columbia, under the care and control of this nurse. If the prosecuting witness had sustained illicit relations with the defendant in the District of Columbia, as she now testifies, why did Miss Fields then take her to Maryland and seek a prosecution there? And why did the prosecuting witness testify before the grand jury in Maryland, as she unquestionably did, that she had no improper relations with the defendant in the District of Columbia? But, apart from these considerations, which alone discredit both the nurse and the prosecuting witness, the testimony as to what is alleged to have occurred is so improbable as to be unbelievable. It is conceded that defendant's father was dying, and that not only the nurse, Fields, but several other persons (including the sister, brother-in-law, and brother of the defendant), were in the house at the time. And yet the prosecuting witness says that the defendant had relations with her in such circumstances, and in a room of which the door was only partially closed. Three witnesses positively and convincingly state that, immediately after bringing Mr. and Mrs. Howe to the house, defendant left for his farm and did not return until night. If this testimony is to be accepted, the testimony of the prosecuting witness cannot be true. It is very significant in this connection that the nurse, Fields, who according to her own testimony was in the house at the time, did not attempt to refute the testimony of these three witnesses as to the defendant's absence.

Taking the evidence as a whole, the story of the prosecuting witness is so inherently improbable, so full of inconsistencies, and so directly discredited, as to be unworthy of belief. In Kidwell v. U. S., 38 App. D. C. 566, a carnal knowledge prosecution, we said:

"In a felony of this enormity, where a conviction will be sustained upon the *unassailed* testimony of a single witness, and that the injured party, and where the difficulty of making a defense is unusually great, it is the duty of the court to carefully safeguard the defendant at every stage of the proceeding, and secure to him a trial legal in all respects." (Italics ours.)

[1] In the light of these observations, we now will consider certain of the assignments of error. It is insisted that it was error to permit the prosecuting witness to testify concerning similar acts between the parties, prior to the offense charged in the indictment. It now is the generally accepted doctrine that, in prosecutions for statutory rape upon one under the age of consent, such testimony is admissible. People v. Thompson, 212 N. Y. 249, 106 N. E. 78, L. R. A. 1915D, 236, Ann. Cas. 1915D, 162; People v. Abbott, 97 Mich. 484, 56 N. W. 862, 37 Am. St. Rep. 360; Evers v. State, 84 Neb. 708, 121 N. W. 1005, 19 Ann. Cas. 96; Boyd v. State, 81 Ohio St. 239, 90 N. E. 355, 135 Am. St. Rep. 781, 18 Ann. Cas. 441; State v. Palmberg, 199 Mo. 233, 97 S. W. 566, 116 Am. St. Rep. 476, and 22 R. C. L. 1205. When this testimony was introduced, the defendant, through his plea of not guilty, in effect had denied sustaining any improper relations with the witness, and according to her testimony the acts of intimacy were continuous and culminated in the particular act charged. Under the rule announced, her testimony therefore was admissible.

[2] In our view, evidence of the marriage and the relations of the parties thereunder was admissible, for two reasons, the first of which already has been made apparent from the statement of the facts. The prosecuting witness denied, not only the fact of the marriage, but that she ever had entertained any affection for the defendant. The excluded letters strongly tended to impeach her. In the circumstances, these letters were most material, for they would have furnished strong corroboration of the defendant's testimony. The final issue was, not whether the defendant had been guilty of improper relations with the prosecuting witness, but whether such relations had been sustained in the District of Columbia, as charged in the indictment. Had these letters been received in evidence, it is inconceivable that the jury would have accepted the statement of the proscuting witness that an offense had been committed within this jurisdiction.

The second reason why this evidence should have been received is to be found in section 808 of our Code, as amended by the Act of April 19, 1920 (41 Stat. 567), authorizing the jury to add to their verdict, "if it be guilty, the words 'with the death penalty,' in which case the punishment shall be death by hanging." While subsequent marriage, as contended by the government, does not constitute a defense, the fact of marriage and the conduct of the defendant thereafter would weigh heavily with the jury in determining whether the extreme penalty should be imposed. In Winston v. U. S., 172 U. S. 303, 19 Sup. Ct. 212, 43 L. Ed. 456, the defendant had been convicted of murder in the first degree, and, the jury having failed to qualify its verdict by adding thereto the words "without capital punishment," the death penalty was to be imposed. It was ruled that the authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court or the jury is of opinion that there are palliating or mitigating circumstances, but that it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose such punishment. After laying down this rule, the court said:

"How far considerations of age, sex, ignorance, illness, or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone."

What more powerful consideration could be brought to the attention of the jury than that the defendant, realizing his responsibilities, had made all possible amends by marrying his victim and thereafter living with and caring for her in good faith? Surely, if the jury in a murder case, under an apprehension that explanatory facts might exist which had not been brought to light, would be justified in qualifying its verdict, evidence of such a cogent character as that under discussion should be before the jury in a case like the present. But, it is said, the exclusion of this evidence could not have prejudiced the defendant because the death penalty was not imposed. This contention is without

merit. Almost all verdicts are the result of compromise, to a greater or less extent. It is natural that this should be so, for it would be most unusual for 12 men to view any question of fact in exactly the same way. It well may have happened that, in the absence of this evidence, certain members of the jury were in favor of imposing the extreme penalty, while other members were for acquittal; the verdict actually reached being the result of compromise. However that may be, it is not for this court to speculate as to the effect of the exclusion of such material evidence. The defendant was entitled to its benefit.

While there are other assignments of error, owing to the fundamental character of those we have discussed, we do not feel it necessary to consider them.

The judgment is reversed and a new trial granted.

Reversed.